# Illinois Official Reports

## Appellate Court

---

### *People v. Wilson*, 2019 IL App (1st) 181486

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. JACKIE WILSON, Defendant-Appellee. |
| District & No. | First District, Second Division No. 1-18-1486 |
| Filed | December 10, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 88-CR-7771; the Hon. William H. Hooks, Judge, presiding. |
| Judgment | Affirmed and remanded. |
| Counsel on Appeal | Michael J. O'Rourke, Special State's Attorney, of O'Rourke & Moody, LLP, of Chicago (Myles P. O'Rourke, Lawrence Rosen, and Robert E. Williams, Assistant Special State's Attorneys, of counsel), for the People.<br><br>G. Flint Taylor, John L. Stainthorp, and Christian Snow, of People's Law Office, and Elliot Slosar, of The Exoneration Project, both of Chicago, for appellee. |

Panel                    JUSTICE LAVIN delivered the judgment of the court, with opinion.
                         Justices Pucinski and Coghlan concurred in the judgment and opinion.

## OPINION

¶ 1    Officers William Fahey and Richard O'Brien were fatally shot while on duty on February 9, 1982. This led to the biggest manhunt in Chicago's history. While in custody, defendant Jackie Wilson (petitioner) gave a statement regarding those murders. He was ultimately convicted of armed robbery and the murder of Officer O'Brien but was acquitted of Officer Fahey's murder. More than 30 years after the shooting, the Illinois Torture Inquiry and Relief Commission (Commission) found there was sufficient evidence that petitioner was tortured to warrant an evidentiary hearing under the Illinois Torture Inquiry and Relief Commission Act (Torture Act) (775 ILCS 40/1 *et seq.* (West 2010)). Following an evidentiary hearing, the trial court suppressed petitioner's statement as the product of torture, vacated his convictions, and ordered a new trial.

¶ 2    On appeal, the State asserts that the trial court (1) misapplied the burden of proof, (2) erroneously prevented the State from questioning petitioner about the contents of his statement, (3) made manifestly erroneous factual findings, and (4) demonstrated bias and unwarranted hostility toward the State. We affirm the trial court's judgment and remand for a new trial.

¶ 3                              I. Background

¶ 4    Initially, we note that the record on appeal contains a staggering amount of evidence. Consequently, we recite only those facts necessary to understand and resolve this appeal.

¶ 5                          A. Motion to Suppress

¶ 6    Petitioner and Andrew Wilson (A. Wilson), petitioner's older brother, were arrested separately on February 14, 1982. A. Wilson arrived at Area 2 headquarters (9059 South Cottage Grove Avenue) between 5:30 a.m. and 6 a.m. At about 8 a.m., the police arrested petitioner at 5157 South Prairie Avenue and transported him to Area 1 headquarters. Four detectives subsequently transported him to Area 2. After being interrogated, petitioner gave a court-reported statement to Assistant State's Attorney (ASA) Lawrence Hyman in the presence of Detective Thomas McKenna and court reporter Michael Hartnett.[1]

¶ 7    According to the statement, petitioner, then 21 years old, and A. Wilson went to Donald White's home (8024 South Carpenter Street) on the afternoon of February 9, 1982. The brothers drove there in their sister's brown Chevrolet. Inside the home, individuals discussed

---

[1]We note that the special prosecutors' statement of facts fails to acknowledge pertinent facts that favor the petitioner, fails to provide necessary citations to the record, and contains improper argument. See Ill. S. Ct. R. 341(h)(6), (7) (eff. May 25, 2018). We also note that the special prosecutors have failed to provide a complete record on appeal. See Ill. S. Ct. R. 321 (eff. Feb. 1, 1994); R. 323 (eff. July 1, 2017); *People v. Hunt*, 234 Ill. 2d 49, 58 (2009) (reiterating that "[a]ny doubts stemming from an inadequate record will be construed against the appellant").

helping Edgar Hope escape from the Cook County Hospital. Hope was in custody for the murder of police officer James Doyle.

¶ 8        After leaving White's home, petitioner and A. Wilson dropped off Derrick Martin and were subsequently pulled over by a police car. Petitioner exited the driver's seat as Officer O'Brien approached the car. When petitioner was unable to produce a license, Officer O'Brien proceeded to search the car. Meanwhile, A. Wilson exited the front passenger seat, and Officer Fahey approached his side of the car. Officer O'Brien then emerged with a .38-caliber firearm that A. Wilson had been carrying and ordered petitioner to freeze. He complied.

¶ 9        As A. Wilson and Officer Fahey disappeared from petitioner's vision, petitioner heard a gunshot. Although not specified in petitioner's statement, he had apparently heard the gunshot that killed Officer Fahey. Petitioner then saw A. Wilson holding a gun and heard another shot. A. Wilson had shot Officer O'Brien. As Officer O'Brien moved around on the ground, A. Wilson yelled at petitioner to get the officer's weapon. Initially, petitioner was scared and did not speak. He then said, however, that Officer O'Brien "was still there, you know. He was up an[d] about." In response, A. Wilson shot at Officer O'Brien four or five more times, picked up the firearms, and said, "Let's go." According to petitioner's statement, he "was still scared, standing there, you know, and [A. Wilson] was hollering move, move, move." Petitioner drove them home and parked their sister's car. The brothers then went their separate ways.

¶ 10       Petitioner and A. Wilson were charged with the murder and armed robbery of both officers. Petitioner, through attorneys Richard Kling and David Thomas, moved to suppress his statement. According to petitioner, the police questioned him without administering *Miranda* warnings or honoring his request for his attorney. See *Miranda v. Arizona*, 384 U.S. 436 (1966). Additionally, the police physically assaulted him and put a gun in his mouth. We note that the motion did not allege petitioner was subjected to electric shock.

¶ 11       At the suppression hearing, the officers who transported petitioner to Area 2 testified that they advised him of his *Miranda* rights. They denied that petitioner asked to speak to his attorney or that they engaged in threatening behavior. Additionally, when they arrived at Area 2 at about 10 a.m., they transferred custody of petitioner to Detective McKenna and Detective Patrick O'Hara. Those detectives testified that petitioner was then advised of his *Miranda* rights for a second time and brought to an office on the second floor. When they asked if he knew why he was there, petitioner referred to the two police officers that were killed. Petitioner voluntarily answered the officers' questions about the murder for 20 to 25 minutes. It is undisputed that Detective McKenna and Detective O'Hara worked under Lieutenant Jon Burge.

¶ 12       ASA Hyman testified that at about 11:45 a.m., petitioner gave his written statement. He did not complain of mistreatment and did not appear to have been beaten. Although ASA Hyman knew petitioner had an attorney before his arrest, he did not ask petitioner if he wanted to speak with him. At 5:30 p.m., ASA Hyman and Hartnett, the court reporter, took a statement from A. Wilson, who was in an office about 35 feet away from petitioner.

¶ 13       In contrast, petitioner testified that on the way to Area 2, the four officers in the car questioned him without administering *Miranda* warnings. When petitioner denied knowing anything about the shooting, the two officers on either side of him in the backseat elbowed him in the chest. The officer in the front passenger seat turned around to slap him in the face several times.

¶ 14    Upon arriving at Area 2 at about 9 a.m., petitioner was rushed upstairs to be interrogated. The police did not immediately administer *Miranda* warnings but did administer them at some point. In the presence of 12 to 16 officers, Detectives McKenna and O'Hara told petitioner that he appeared to be a victim of circumstances and should "come straight."[2]  Petitioner asked to talk to Fredrick Solomon, his lawyer, and showed them his business card. They responded that he did not "need no fucking lawyer." When petitioner said he did not want to talk, five or six officers beat him. In an interrogation that lasted one to two hours, officers hit him with a telephone book and a dictionary, poked him, slapped him, shook him, twisted his head, twisted his fingers, and kicked him in the groin. One officer put a cocked revolver in petitioner's mouth and asked if it made him nervous, to which petitioner replied, "Damn right." When Detective O'Hara slapped petitioner, Detective McKenna told him not to damage petitioner's face.

¶ 15    The officers asked petitioner what he did after Officer Fahey was shot. Petitioner said he "was doing nothing," which led the officers to kick him in his side and stomach. Petitioner then told the police that he froze when Officer Fahey was shot. According to petitioner, he told the police that after the second shot he "was shocked and *** started backing out [of] the way." During the interrogation, petitioner denied knowing White and Martin. He later acknowledged, however, that he knew the two individuals by their respective aliases, Kojak and Dee. Petitioner eventually agreed to answer questions because he heard A. Wilson screaming and heard furniture being kicked.

¶ 16    Petitioner then gave ASA Hyman a written statement in the presence of Detective McKenna and Hartnett. The police had warned petitioner that if he did not tell ASA Hyman what the police wanted him to say, the police would "start all over again." Despite that warning, petitioner told ASA Hyman he would not sign the statement without talking to his lawyer. ASA Hyman and Hartnett then left the room, and Detective O'Hara threatened to break petitioner's fingers unless he signed. Furthermore, petitioner's initials were different on each page because his fingers were swollen, and he was nervous. Detective O'Hara subsequently ordered him to smile for a photograph.

¶ 17    When petitioner saw A. Wilson at the criminal court building the next day, A. Wilson had a patch over his eye and a patch on the back of his head, where he had been hit with a .45-caliber semiautomatic weapon. Additionally, A. Wilson had burns all over his body. It was obvious to petitioner that "the police had jumped on him."

¶ 18    Following argument, Judge John Crowley denied petitioner's motion.

¶ 19                    B. Petitioner's First Trial and Direct Appeal

¶ 20    Following a joint trial, the jury found petitioner and A. Wilson guilty of two counts of armed robbery and two counts of first degree murder. The court sentenced petitioner to concurrent 30-year prison terms for armed robbery and natural life in prison for the murders. A. Wilson was sentenced to death.

¶ 21    On direct appeal, the reviewing court initially rejected petitioner's challenge to the denial of his motion to suppress but found that reversible error occurred during *voir dire*. *People v. Wilson*, 139 Ill. App. 3d 726 (1985). The supreme court then reversed that determination and remanded the cause with directions to consider petitioner's remaining issues. *People v. Wilson*,

_____
[2] Petitioner demonstrated difficulty in identifying officers by name. Additionally, the State acknowledges on appeal that Burge did not testify at petitioner's suppression hearing.

- 4 -

112 Ill. 2d 567 (1986) (supervisory order). Shortly thereafter, however, the supreme court determined that A. Wilson's statement was involuntary and should have been suppressed based on evidence showing that he sustained 15 separate injuries to his head, torso, and leg while in police custody. *People v. Wilson*, 116 Ill. 2d 29 (1987); see also *People v. Wrice*, 2012 IL 111860, ¶ 57 (stating that A. Wilson's case was the first Area 2 brutality case to reach the supreme court). According to A. Wilson, he was kicked, punched, smothered with a bag, subjected to electric shock, and burned against a radiator. *Wilson*, 116 Ill. 2d at 35.

¶ 22   On remand to the appellate court in petitioner's case, he filed a supplemental brief urging the court to reconsider his challenge to the denial of his motion to suppress. The court upheld the denial of petitioner's motion but reversed and remanded for a new trial so that petitioner could be tried separately from A. Wilson. *People v. Wilson*, 161 Ill. App. 3d 995 (1987).

¶ 23                              C. Petitioner's Second Trial and Appeal

¶ 24   At petitioner's second trial, Tyrone Sims essentially testified that he witnessed this shooting through his living room window. When Officer Fahey approached the passenger side of the Chevrolet, A. Wilson exited the car, throwing his jacket inside. Officer Fahey seemed to order A. Wilson to retrieve the jacket, and A. Wilson complied. Upon searching the jacket's pockets, Officer Fahey "apparently found something that caused him to grab [A. Wilson]." A struggle ensued. Additionally, Officer O'Brien grabbed petitioner, who did not struggle or brandish a weapon.

¶ 25   A. Wilson then removed Officer Fahey's service revolver from its holster and shot him in the back of the head. Next, A. Wilson shot Officer O'Brien, who fell to the ground. Once Officer O'Brien was down, A. Wilson fired two more shots at him and shouted, "Let's get out of here." Sims acknowledged testifying at petitioner's first trial that when A. Wilson yelled for them to leave, petitioner did not get in the car. Instead, he stood there with a blank look on his face, as if he was in a state of shock.

¶ 26   Dwayne Hardin, a passerby, testified that he saw petitioner and A. Wilson getting in the Chevrolet and smiling as they drove away from the scene. Hardin apparently recanted that testimony in recent years.

¶ 27   The State presented evidence that the officers' service revolvers were recovered from the back of Willie's Beauty Shop, where A. Wilson had been staying. Additionally, the State introduced petitioner's court-reported statement as well as certain statements petitioner was alleged to have made in prison. The statements made in prison claimed responsibility for the murders of Officers Fahey and O'Brien. Inmate William Coleman, also known as William Clarkson, also testified that petitioner and A. Wilson planned a mass escape, in part so that petitioner could kill Sims, the occurrence witness to the murder. We note that a trial within a trial ensued as to the credibility of Coleman's account. See also *Wilson v. City of Chicago*, 6 F.3d 1233, 1239 (7th Cir. 1993) (referring to Coleman as a peripatetic felon and consummate liar).

¶ 28   The jury found petitioner guilty of both armed robberies and the murder of Officer O'Brien but acquitted petitioner of Officer Fahey's murder. The trial court sentenced petitioner to natural life in prison for murder and 30 years' imprisonment for the armed robberies. On direct appeal, the reviewing court rejected petitioner's assertion that his confession should have been suppressed, citing the law of the case doctrine. *People v. Wilson*, 257 Ill. App. 3d 670 (1993).

## D. Lieutenant Burge and His Subordinates

Meanwhile, on February 11, 1993, Lieutenant Burge was fired for the torture and abuse of A. Wilson. Additionally, the Chicago Police Board suspended Detective O'Hara for failing to stop the torture or provide medical treatment. In the ensuing years, many more torture claims would surface.

In 2002, the Cook County State's Attorney was found to have a *per se* conflict of interest in matters involving allegations that Burge and his subordinates used torture to coerce confessions. The Office of the Special Prosecutor (OSP) has represented the State's interests in these matters since then. In 2006, the OSP, under retired Illinois Appellate Court Justice Edward Egan and Robert Boyle, found that Burge and his subordinates used torture in at least 70 cases. In August 2009, the Torture Act took effect and gave felons an avenue to present "credible evidence related to allegations of torture committed by Commander Jon Burge or any officer under the supervision of Jon Burge." 775 ILCS 40/5 (West 2010). In June 2010, a federal jury convicted Burge of perjury and obstruction of justice for falsely denying that he tortured A. Wilson and others.

## E. Proceedings Under the Torture Act

In 2011, petitioner filed a claim with the Commission, once again alleging that he was tortured in Area 2. He added to the aforementioned allegations of torture that officers subjected him to electric shock. The Commission concluded, "While the evidence gathered and reviewed by the Commission has elements both supporting and detracting from [petitioner's] claim of torture, on balance, there is sufficient evidence of torture to merit judicial review."[3]

Before the trial court, petitioner asked Judge Hooks to find that his statement was coerced and needed to be suppressed. The parties presented live testimony as well as testimony from various depositions and other cases involving petitioner, A. Wilson, Burge, and his subordinates. ASA Hyman, Burge, and Detective McKenna all invoked their fifth amendment privilege against self-incrimination. Detective O'Hara was by then deceased.

Similar to his testimony at the motion to suppress hearing, petitioner testified that on the way to Area 2, officers questioned him about the murders, elbowed him, and backhanded him in the face. At Area 2, he encountered Detective McKenna and Detective O'Hara. Although petitioner was unable to identify them by name, he identified their photographs. Petitioner testified that the detectives hit him and accused him of lying. Detective McKenna hit him with a phonebook, kicked him in the groin, causing him to urinate, and choked him. Furthermore, Detective McKenna put a revolver in his mouth. At some point, Burge entered, although petitioner did not know his name in 1982. Burge told Detective O'Hara to stop hitting petitioner in the face because they did not want to leave marks, like they had done with his brother. Eventually, Burge said, "I am getting tired of this s***. I got something that will make him talk." He brought in a black box, connected wires to petitioner's hand and turned a crank, causing him to feel a jolt.

---

[3]The Commission first reached that conclusion in May 2013 but withdrew that disposition due to the failure to notify the victims' families. The Commission reached the same conclusion in May 2015.

¶ 36    The trial court also received petitioner's deposition testimony from Alton Logan's civil action against Burge.[4] According to petitioner's testimony in that case, "they came in with the electric deal and hit me with that a bit," causing him to urinate. It was Burge's idea to use the box, which had "a little wind-up gizmo on it, you know, with some wires." According to petitioner, he told Kling in 1982 that the black box had been used.

¶ 37    Kling testified, "I have no specific recollection of anything that [petitioner] told me. My recollection has been refreshed from the transcript, but this is 35 years ago and hundreds of murder cases later. I have no independent recollection." Kling did not recall whether petitioner ever told him that Burge used electric shock torture but believed he would have included that allegation in petitioner's motion to suppress.

¶ 38    We note that a logbook from Cermak Hospital's emergency room shows that on the day after his arrest, petitioner was brought to the hospital for a full physical and psychiatric exam. The log entry noted a laceration on petitioner's leg but did not refer to any other injuries.

¶ 39    Hartnett testified that on February 14, 1982, petitioner did not give ASA Hyman a business card or ask for a lawyer. Petitioner looked fine and did nothing to indicate he was under coercion. Additionally, Hartnett detected no sign that petitioner had urinated on himself. That being said, Hartnett acknowledged he did not care whether petitioner was beaten and was surprised that he was even alive given the crime involved. Although A. Wilson was visibly injured during his statement, Hartnett did not know or care what happened to him. Hartnett considered Burge to be a friend.

¶ 40    Officer Chester Batey testified that petitioner was read his rights at the time of his arrest and, shortly thereafter, said that A. Wilson did the shooting while petitioner did the driving. When Officer Batey went to Area 2 that morning, he did not see Burge or hear anything unusual.

¶ 41    On June 14, 2018, the trial court entered a 119-page opinion finding that petitioner's statement must be suppressed as a product of coercion. The court found that on the way to Area 2, petitioner was elbowed, hit in the face and told he was going to talk. Moreover, the officers alleged to have elbowed and struck petitioner on the way to Area 2 invoked the fifth amendment, leading the court to infer that they had assaulted petitioner.

¶ 42    On the second floor of Area 2, Detectives McKenna and O'Hara interrogated petitioner at Burge's behest. When petitioner denied knowledge of the murders, the detectives would hit and kick him, and call him a liar. At one point, Detective McKenna choked petitioner and put a revolver in his mouth. Additionally, Burge entered as Detective O'Hara was slapping petitioner in the face and told him to stop. Meanwhile, petitioner could hear his brother screaming. Eventually, Burge retrieved the black box, attached wires to petitioner's hand, and wound up the box, causing petitioner to feel an electrical jolt.

¶ 43    The trial court also found that petitioner gave Solomon's business card to ASA Hyman and asked to see Solomon. In addition, ASA Hyman did not ask petitioner whether he had been physically coerced, contrary to the practice of his office. Given the OSP's 2006 finding that ASA Hyman gave false testimony when he denied A. Wilson told him he was tortured, and given ASA Hyman's invocation of the fifth amendment, the court inferred that ASA Hyman knew petitioner was tortured. The court similarly inferred that Detective McKenna and Burge

---

[4]After serving 26 years in prison for murder, Logan was exonerated.

participated in petitioner's torture given their invocation of the fifth amendment. Additionally, A. Wilson testified in 1988 that petitioner told him he had been subjected to electric shock and petitioner made the same allegation during a 2010 deposition. Burge himself told others that the Wilson brothers were tortured and that he had used the black box. Finally, the court stated, "That Burge and his underlings would torture potential suspects and witnesses, including [A. Wilson], but then simultaneously reverse course during their simultaneous interrogation of [petitioner] defies both reality and the evidence."

¶ 44                                    II. Analysis
¶ 45                                   A. The Burden
¶ 46      On appeal, the State first contends that the trial court erroneously placed the burden of proving that petitioner's statement was voluntary on the State. To resolve this contention, we must establish the nature of the Torture Act and the hearing that ensued.

¶ 47      "This Act establishes an extraordinary procedure to investigate and determine factual claims of torture related to allegations of torture that shall require an individual to voluntarily waive rights and privileges as described in this Act." *Id.* § 10. Pertinent to this appeal, a claim of torture is defined as "a claim on behalf of a living person convicted of a felony in Illinois asserting that he was tortured into confessing to the crime for which the person was convicted and the tortured confession was used to obtain the conviction and for which there is some credible evidence related to allegations of torture committed by Commander Jon Burge or any officer under the supervision of Jon Burge."[5] *Id.* § 5. "If 5 or more of the 8 voting members of the Commission conclude by a preponderance of the evidence that there is sufficient evidence of torture to merit judicial review, the case shall be referred to the Chief Judge of the Circuit Court of Cook County ***." *Id.* § 45(c). To be clear, the Commission's disposition of a torture claim is not a final determination that the claimant proved he was tortured; rather, it is merely a finding that there is sufficient evidence to proceed to the circuit court. *People v. Christian*, 2016 IL App (1st) 140030, ¶ 79; see also 2 Ill. Adm. Code 3500.385(b)(1) (2014) (stating that the Commission need not find it more likely than not that torture occurred in order to refer a claim for judicial review).

¶ 48      When a case is referred, "[t]he court may receive proof by affidavits, depositions, oral testimony, or other evidence." 775 ILCS 40/50(a) (West 2010).

> "Notwithstanding the status of any other postconviction proceedings relating to the petitioner, if the court finds in favor of the petitioner, it shall enter an appropriate order with respect to the judgment or sentence in the former proceedings and such supplementary orders as to rearraignment, retrial, custody, bail or discharge, or for such relief as may be granted under a petition for a certificate of innocence, as may be necessary and proper." *Id.*[6]

---

[5]The Torture Act has since been amended to remove the requirement that the torture be committed by Burge or his subordinates. See 775 ILCS 40/5 (West 2016).

[6]Section 122-6 of the Post-Conviction Hearing Act similarly states that if the court finds in the petitioner's favor, "it shall enter an appropriate order with respect to the judgment or sentence in the former proceedings and such supplementary orders as to rearraignment, retrial, custody, bail or discharge as may be necessary and proper." 725 ILCS 5/122-6 (West 2016).

Thus, the court has a variety of remedies at its disposal. While the statute enumerates the award of a new trial as one form of available relief, suppressing a confession would also constitute "an appropriate order with respect to the judgment." Moreover, at oral arguments in this matter, the State conceded that the Torture Act authorizes the trial court to suppress a confession. We also find that legislative history indicates that a trial court may suppress a statement when referred a case pursuant to the Torture Act.

¶ 49    At a hearing before the Senate, former Senator Kwame Raoul stated that the Torture Act was "about victims of torture seeking relief." 96th Ill. Gen. Assem., Senate Proceedings, Mar. 25, 2009, at 26 (statements of Senator Raoul). He added:

> "[T]here are people who may currently be incarcerated who may not *** need to be there. And there are people who may have served time who may want to clear their name. And this torture commission would allow them a vehicle to do so. *** You know, we're trying to create a vehicle where there would be a commission who will confront this issue once and for all." *Id.* at 27.

Representative Reboletti stated shortly thereafter that "if there are people wrongfully imprisoned, they should be released as… as soon as possible." 96th Ill. Gen. Assem., House Proceedings, May 13, 2009, at 17 (statements of Representative Reboletti).

¶ 50    These remarks indicate that the Torture Act was intended to definitively and expeditiously decide whether a petitioner was tortured and provide appropriate relief. Additionally, these goals, as well as judicial economy, are furthered by permitting the trial court to simultaneously consider a petitioner's claim under the Torture Act and his request to suppress his statement. See *People v. Gibson*, 2018 IL App (1st) 162177, ¶ 139 (stating that the trial court's inquiry at a suppression hearing significantly overlaps with the inquiry at an evidentiary hearing on police torture). We now determine the appropriate burden to be applied at a simultaneous hearing.

¶ 51    An evidentiary hearing under the Torture Act has been likened to a third-stage evidentiary hearing under the Post-Conviction Hearing Act (Post-Conviction Act) (725 ILCS 5/122-1 *et seq.* (West 2016)), at which the claimant has the opportunity to demonstrate by a preponderance of the evidence that his confession resulted from coercion. *Christian*, 2016 IL App (1st) 140030, ¶ 78 (citing State of Ill. Torture & Relief Comm'n, TIRC Home, https://www2.illinois.gov/sites/tirc/pages/default.aspx (last visited Dec. 2, 2019) [https://perma.cc/ZXM2-9K3P]). Like the trial court, however, we find a petitioner's initial burden does not require him to prove that his confession actually resulted from coercion.

¶ 52    First, even an evidentiary hearing under the Post-Conviction Act is not intended to decide the ultimate issue of whether the petitioner's confession was coerced. See *People v. Whirl*, 2015 IL App (1st) 111483, ¶ 80. Instead, the petitioner has the burden of showing only that newly discovered evidence *would likely have* altered the result of a suppression hearing. See *id.*; see also *People v. Galvan*, 2019 IL App (1st) 170150, ¶ 74 (finding the trial court's denial of postconviction relief was against the manifest weight of the evidence where new evidence of abusive tactics that an officer used in interrogating others would likely have led to a different outcome at the suppression hearing). Given the similarities between evidentiary hearings under the Post-Conviction Act and the Torture Act, we find a petitioner's initial burden under the Torture Act is the same. The legislature clearly did not create a new form of postconviction relief with the intent that a petitioner satisfy a heavier burden than that imposed by the Post-Conviction Act. See 775 ILCS 40/50(a) (West 2010) (allowing a court to award relief "[n]otwithstanding the status of any other postconviction proceedings"). As stated, however, a

hearing under the Torture Act may provide relief beyond the relief available under the Post-Conviction Act. Specifically, a petitioner may obtain the suppression of his statement.

¶ 53    At a motion to suppress hearing, "the State bears the burden of proving the confession was voluntary by a preponderance of the evidence." *People v. Slater*, 228 Ill. 2d 137, 149 (2008). Once the State has established its *prima facie* case that the statement was voluntary, the burden shifts to the defendant to present evidence that the confession was involuntary. *People v. Richardson*, 234 Ill. 2d 233, 254 (2009). If the defendant satisfies his burden, the burden reverts to the State. *Id.*

¶ 54    We find that after a petitioner satisfies his initial burden of showing that new evidence would likely have resulted in the suppression of his confession, the State has the burden of proving petitioner's statement was voluntary, just as it would at a motion to suppress hearing. The burden shifting provisions involved in a motion to suppress likewise apply.

¶ 55    Here, after finding that petitioner satisfied his initial burden, the trial court found the State could arguably make a *prima facie* case that petitioner's confession was voluntary. Additionally, the court found petitioner was able to "present sufficient evidence his confession was involuntary so as to revert the burden back to the State." That being said, "the evidence adduced in this hearing establishes that the State is incapable of rebutting that [petitioner's] statement was involuntary." The court concluded, "[petitioner] has made the requisite showing, not only that the probability the outcome of his suppression hearing would differ had the witnesses been subject to impeachment, but, more, that the State could not meet its burden to show [petitioner's] statement was voluntary in a new suppression hearing." The court correctly identified and applied the relevant standards. Even assuming that the trial court should have applied the standard annunciated in *Christian*, at the end of the day, the court clearly found that petitioner demonstrated by a preponderance of the evidence that his confession resulted from coercion. See *Christian*, 2016 IL App (1st) 140030, ¶ 78. We find no error.

¶ 56                          B. The Contents of the Statement

¶ 57    Next, the State asserts that the trial court erroneously prevented it from questioning petitioner about the content of his statement. According to the State, where a petitioner's confession mitigates his involvement in the crime, the confession also negates evidence of coercion.

¶ 58    The trial court's evidentiary rulings, which involve the court's oversight of the courtroom and maintenance of a case's progress, will not be reversed absent an abuse of discretion. *People v. Jones*, 2012 IL App (1st) 093180, ¶ 52. An abuse of discretion exists only where the court's evidentiary rulings are fanciful, arbitrary, or unreasonable or when no reasonable person would take the trial court's view. *Id.* Additionally, "[a] trial court may reject offered evidence on grounds of irrelevancy if it has little probative value due to its remoteness, uncertainty, or possibly unfair prejudicial nature." *People v. Ward*, 101 Ill. 2d 443, 455 (1984).

¶ 59    To determine whether a confession was voluntary, courts must consider whether the petitioner's will was overborne at the time of his confession. *People v. Kincaid*, 87 Ill. 2d 107, 117 (1981). "It is unlikely that a person whose will was overborne would be unable to resist confessing, yet at the same time attempt to mitigate the effect of a confession." *Id.* at 120; see also *Christian*, 2016 IL App (1st) 140030, ¶ 110 (finding the trial court properly considered that the petitioner's statement minimized his action). That being said, "[t]he truthfulness or reliability of a confession is irrelevant in determining whether it was voluntarily made."

- 10 -

*Kincaid*, 87 Ill. 2d at 117; see also *People v. Galarza*, 391 Ill. App. 3d 805, 810 (2009) ("at a hearing on a motion to suppress, the content of a defendant's statements is immaterial"). Coerced confessions, whether true or false, may not be used because the methods of extracting them offend the underlying principle that our system is accusatorial, not inquisitorial. *Gibson*, 2018 IL App (1st) 162177, ¶ 106. The erroneous use of a physically coerced confession as substantive evidence is never harmless. *Id.* ¶ 107.

¶ 60    Despite the State's characterization of this issue, we agree with petitioner that the State below essentially sought to question petitioner about the facts of the underlying crime rather than the statement itself. Additionally, the record shows that the court permitted the State to argue that petitioner was attempting to minimize his involvement by alleging he was only the driver. Furthermore, the court did not restrict the State from using the statement itself to argue it was voluntary. The State's reply brief contains no further argument on this matter. Accordingly, we find no abuse of discretion.

¶ 61                                      C. Manifest Error

¶ 62    The State further asserts that the trial court's factual findings were against the manifest weight of the evidence. See *People v. Pratt*, 2018 IL App (5th) 170427, ¶ 19; *Christian*, 2016 IL App (1st) 140030, ¶ 106. In order to be against the manifest weight of the evidence, the court's decision must be arbitrary, unreasonable, and not based on the evidence. *Jones*, 2012 IL App (1st) 093180, ¶ 49. Additionally, the trial judge, who is in the best position to observe the witnesses, occupies an advantageous position warranting deference. *Christian*, 2016 IL App (1st) 140030, ¶ 106; see also *People v. Johnson*, 208 Ill. 2d 118, 138 (2003) (stating that in reviewing the trial court's ruling on a motion to suppress, that ruling may be affirmed on any ground in the record).

¶ 63    To determine whether a statement was voluntary, courts consider the totality of circumstances, including the presence of *Miranda* warnings, the duration of questioning, and any physical or mental abuse. *Richardson*, 234 Ill. 2d at 253-54. Additionally, "a series of incidents spanning several years can be relevant to establishing a claim of a pattern and practice of torture." *People v. Patterson*, 192 Ill. 2d 93, 140 (2000).

¶ 64    Here, the State ignores a plethora of evidence that corroborates petitioner's claim of torture and supports the court's findings. Petitioner's allegations have remained substantially the same for more than 30 years. He has consistently alleged that he was elbowed and slapped on the way to Area 2. He has maintained that he was hit with books and that a gun was put in his mouth. Compare *Gibson*, 2018 IL App (1st) 162177, ¶ 120 (stating that while details had varied, "the core allegations have remained the same: a group of detectives *** repeatedly slapped, punched, and kicked him, primarily in his chest"), with *Christian*, 2016 IL App (1st) 140030, ¶¶ 107-10 (finding the trial court's determination that the petitioner had not shown he was tortured was not against the manifest weight of the evidence where the petitioner gave four different versions of his actions and his final version minimized his involvement); see also *Whirl*, 2015 IL App (1st) 111483, ¶ 84 (stating in the context of the Post-Conviction Act that slight differences between the petitioner's present and past testimony were only marginally relevant to whether new evidence showing a pattern and practice of abusive tactics would have produced a different outcome at a suppression hearing).

¶ 65    The State nonetheless challenges the credibility of petitioner's allegation that Burge participated in torturing him because he did not refer to Burge at the initial suppression hearing.

- 11 -

Petitioner demonstrated difficulty in identifying officers by name at the suppression hearing. Unlike Detectives McKenna and O'Hara, Burge did not testify at that hearing. While Burge was discussed at A. Wilson's suppression hearing, petitioner's suppression hearing apparently occurred first. The State has forfeited its contention that petitioner was present at A. Wilson's hearing by failing to provide a citation to the record in support thereof. Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018); *People v. Sprind*, 403 Ill. App. 3d 772, 778-79 (2010) (stating that the failure to support argument with citation to the pages of the record results in forfeiture). Moreover, evidence supports the court's determination that petitioner's allegations regarding electric shock were made well before petitioner filed his petition under the Torture Act. A. Wilson testified at a 1988 deposition that petitioner had said he was subjected to electric shock, and petitioner testified in a 2010 deposition that he was subjected to electric shock.

¶ 66    Furthermore, the decision of government actors to invoke their fifth amendment privilege against self-incrimination is judicially deafening under the facts of this morbid tale of improper law enforcement. As the trial court recognized, and as we affirm, the fifth amendment does not preclude a trier of fact from making an adverse inference that a party's refusal to testify is evidence of guilt. *Gibson*, 2018 IL App (1st) 162177, ¶ 85. Instead, the court may treat a party's refusal to testify as evidence of the misconduct alleged. *Id.* This court has stated, "when, in the face of a credible allegation, an officer of the court is unwilling to assure the court that he and his colleagues did not physically coerce a confession, when he determines that a truthful answer could subject him to criminal liability, the court should take careful note." (Emphasis omitted.) *Id.* ¶ 108.

¶ 67    Here, ASA Hyman, Burge, and Detective McKenna all refused to testify, invoking their fifth amendment privilege against self-incrimination. Three of the officers who transported petitioner to Area 2 also invoked the fifth amendment. We further note that the OSP found in 2006 that ASA Hyman gave false testimony when he denied that A. Wilson reported torture to ASA Hyman. The court was entitled, albeit not required, to treat this as evidence of misconduct.

¶ 68    The State, relying heavily on the OSP's 2006 report, contends there were "dramatic inconsistencies in [petitioner's] version of events at Area 2." That report found that petitioner made no complaint to ASA Hyman, there was no medical evidence of physical injuries and that A. Wilson made it clear that Detectives McKenna and O'Hara did not mistreat him.

¶ 69    First, the court, as the trier of fact, was not bound by the OSP's report. The State also overlooks that the court had more information at its disposal in 2018 than the OSP had in 2006. Additionally, there is no requirement that petitioner's allegations be supported by obvious physical injury, and it is hardly surprising that his torturers would avoid leaving a mark. See *People v. Reyes*, 369 Ill. App. 3d 1, 22 (2006) (stating that the absence of visible signs of physical abuse is relevant but not dispositive). We also know now that petitioner was taken to the hospital after giving his statement. Furthermore, A. Wilson's testimony that Detectives McKenna and O'Hara did not participate in his torture in no way negates petitioner's testimony that the same detectives tortured him.[7]

---

[7]The State asserts in a conclusory fashion that "[c]ertain of the trial court's findings of fact, specifically, paragraphs 121, 124-127, 129, 131-149, 151, 164, 171, 173-86, 205, 223 and 232, are manifestly erroneous for several compelling reasons." Yet, the State has failed to develop a cohesive argument explaining why each of the enumerated findings was in error. See Ill. S. Ct. R. 341(h)(7) (eff.

¶ 70 In its reply brief, the State adds that the timeline did not support petitioner's testimony that he was tortured for an hour or more. The State has forfeited this contention by failing to include this assertion in its opening brief. Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (stating that "[p]oints not argued are forfeited and shall not be raised in the reply brief"). Forfeiture aside, there is no minimum duration that one must be tortured before his statement will be deemed coerced. Furthermore, petitioner has repeatedly indicated that he was not wearing a watch on the day of his arrest and was estimating time frames based on his subjective impression. Petitioner has not asserted the hard timeline that the State suggests. See also *Gibson*, 2018 IL App (1st) 162177, ¶ 125 (recognizing that "[d]isparities in fine-grained detail are routinely present in witness's accounts, particularly those of stressful events").

¶ 71 Simply put, the State has not demonstrated that the trial court's findings were against the manifest weight of the evidence.

¶ 72                    D. Prejudice Toward the State

¶ 73 Finally, the State asserts that this matter should be remanded for a new hearing before a different judge because the record is full of instances where the trial judge demonstrated animosity, hostility, ill will, distrust, prejudice, predilections, and arbitrariness toward the State, the Cook County State's Attorney Office, the OSP, and the Chicago Police Department. We disagree.

¶ 74 Judges are presumed to be impartial. *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 31. The party asserting that the trial court was prejudiced has the burden of demonstrating actual prejudice. See *People v. Vance*, 76 Ill. 2d 171, 178 (1979). To have a matter remanded to a new judge, a party must demonstrate that the judge displayed hostility, animosity, distrust, ill will, prejudice, predilections, or arbitrariness. See *Reyes*, 369 Ill. App. 3d at 25. That being said, judicial remarks that are critical of, or merely hostile to, counsel or the parties ordinarily do not show bias. *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 31. Expressions of dissatisfaction, annoyance, impatience, and anger are within the bounds of what judges sometimes display and do not establish bias or partiality. See *Liteky v. United States*, 510 U.S. 540, 555-56 (1994). Furthermore, "[a] judge's ordinary efforts at courtroom administration— even a stern and short-tempered judge's ordinary effort at courtroom administration—remain immune." *Id.* at 556.

¶ 75 The determination that a judge is disqualified due to prejudice is not to be made lightly. See *Reyes*, 369 Ill. App. 3d at 25. Such a determination reflects unfavorably upon the judge and tends to disrupt the judicial system. *Vance*, 76 Ill. 2d at 179. Additionally, the trial judge is ordinarily the best situated to decide whether he was prejudiced. *Id.* at 178.

¶ 76 First, the State contends that the trial judge relied on matters outside of the record to justify the suppression of petitioner's confession. The State points to the following concluding remarks:

"Much more was required of the Chicago Police Department, the office of the Cook County State's Attorney, our courts, the private and public defense bar and, indeed, our federal government. In this matter, as well as dozens of related cases, too many postconviction tribunals and Torture Commission [cases] have been forced to conduct

May 25, 2018); *People v. Edwards*, 2012 IL App (1st) 091651, ¶ 29 (recognizing that reviewing courts are entitled to clearly defined issues and cohesive arguments).

- 13 -

post-mortem examinations of the torture and death of nothing less than our constitution at the hands of Jon Burge and his crew[.] The abhorrence of basic rights of suspects by Mr[.] Burge and his underlings has been costly to the taxpayers, the wrongfully convicted, and worst of all, the dozens of victims and their families who have suffered untold grief—in many cases, a 30-plus year horror story."

Yet, the State has failed to identify which portion of this concluding statement is outside the record, and its contention is forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018). Additionally, the State ignores that the challenged statements followed more than 100 pages of detailed findings and analysis. Furthermore, the State, as represented by the special prosecutors in this case, demonstrated a stunning level of denial about the well-established practice of torture in Area 2 and findings of torture made by the special prosecutors' own predecessors.[8]

¶ 77    The State also contends that the trial judge expressed bias by strongly criticizing the police for costing taxpayers millions of dollars and by inappropriately stating that detectives and ASAs were involved in a conspiracy to shield misconduct. Simply put, the record, whether by direct evidence or inference, supports the judge's findings. Additionally, the record rebuts the State's assertion "that at every opportunity, Judge Hooks went out of his way to attack the Special Prosecutor." On numerous occasions, the trial judge overruled petitioner's objections and sided with the State.

¶ 78    Furthermore, the court's comments questioning the OSP's actions or lack thereof merely demonstrate that he appreciated the gravity of this case and the time and expense that would be wasted if this matter was not handled with diligence and care. To the special prosecutors here, the court stated, "[i]t looks like you're working hand in hand with the defense attorneys that are representing the detectives and police officers that may have been involved in the matters that are before this court." Although the trial court employed such remarks in questioning why the special prosecutors had not challenged officers' entitlement to invoke the fifth amendment, this was entirely consistent with the foregoing concerns.[9] It is well settled that the American prosecutor plays a special role in the search for truth: the prosecutor's interest is in seeing that justice is done, not winning a case. See *People v. Beaman*, 229 Ill. 2d 56, 73 (2008) (citing *Strickler v. Greene*, 527 U.S. 263, 281 (1999)).

¶ 79    Moreover, the trial judge learned just prior to petitioner's evidentiary hearing that Assistant Special Prosecutor Brian Stefanich had left the OSP to become a defense attorney for Burge in federal court. The trial judge was caught off guard, to say the least, but Special Prosecutor Michael O'Rourke stated that Stefanich had not acted improperly because "the interest of the people and the petitioners in that case are aligned."

---

[8]During opening statements, the special prosecutors were unwilling to concede that Burge engaged in a pattern and practice of torture and conceded only that Burge and "[h]is subordinates did on occasion engage in abusive activities." The special prosecutors did not grasp that they were bound by their predecessors' finding that there was sufficient proof of abusive tactics by Burge's subordinates in at least 70 cases and only reluctantly conceded that that was the case.

[9]During opening statements, the special prosecutors indicated they planned to ask for the court's assistance concerning persons who were taking the fifth in this case, but Judge Hooks explained that any such request would be too late at that juncture.

¶ 80      The trial judge responded, "Are you telling me this after hundreds of thousands of dollars of taxpayers' funds have been expended because of a purported conflict \*\*\* you're stating that convicted felon Jon Burge's interests are aligned with the special prosecutor's interest in this matter before this Court?" The judge also stated that "the court has an obligation to look at ethical issues that surface." Although he acknowledged that he did not know how this issue was going to be resolved, he suggested that petitioner's attorney file a motion. The judge explained that in addition to his primary role in presiding over this matter, his secondary role was "to review the expenditure of taxpayer funds." To that end, he believed he needed to know how much money the special prosecutors received in Burge torture cases. He stated, "If you all have done ethical review and you firmly believe there's no problem, then you've taken your position, you know. I just have a separate obligation to review that position in another form and another time."

¶ 81      With respect to this situation, there can be little doubt that the trial judge was annoyed, dissatisfied, and stern. Yet, he ultimately ruled that

> "[a]fter having had an opportunity to review the materials referenced above in view of the parties' relative positions on the issue, the Court concurs in the joint assessment of the parties that no present controversy now exists in this case which would warrant further review or action by this Court, a disciplinary body or a special master appointed by the Court."

He added, "nothing raised in the context of the Court's inquiry in its supervisory capacity as to past billing practices is to in any way be construed as a suggestion of impropriety." The State has not shown that the trial judge was prejudiced or biased.

¶ 82                      III. Conclusion

¶ 83      Here, the trial court properly identified and applied the burden of proof. Additionally, the court did not err by precluding the State from questioning petitioner regarding the underlying crime. Furthermore, the court's findings were not against the manifest weight of the evidence and the State has not shown that the court was prejudiced or biased. Accordingly, we affirm the judgment in all respects and remand for a new trial.

¶ 84      Affirmed and remanded.