2021 IL App (1st) 201072-U

SECOND DIVISION
December 21, 2021

1-20-1072

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Respondent-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 98 CR 25742 |
| | ) | |
| DARRELL FAIR, | ) | Honorable |
| | ) | Peggy Chiampas, |
| Petitioner-Appellant. | ) | Judge Presiding. |

JUSTICE HOWSE delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

ORDER

¶ 1      *Held:* We affirm the trial court's order denying petitioner relief; petitioner was kicked in the leg by a police officer shortly after his arrest; however, the officer who kicked petitioner was not present when petitioner made inculpatory statements a day later; therefore, petitioner failed to establish that his statements were the product of torture, and he is not entitled to relief.

¶ 2      William Jones and Chris Stubblefield were robbed at gunpoint in the early morning hours of July 22, 1998. The gunman fatally shot Stubblefield when he tried to walk away. Over a month later, police arrested petitioner Darrell Fair. After his arrest, Fair made inculpatory statements that were admitted at the 2003 trial which resulted in his conviction for murder.

¶ 3      Years later, petitioner filed a claim before the Illinois Torture Inquiry and Relief Commission alleging his inculpatory statement was the product of physical abuse by detectives

at Area 2. In his claim, petitioner alleged a detective kicked his leg and threatened to shoot him during questioning. He also alleged he was denied sleep, food, asthma medication, and access to a lawyer. The Commission interviewed petitioner about his claim and determined there was sufficient evidence of torture to merit judicial review. The Commission referred petitioner's claim to the circuit court for an evidentiary hearing under the Illinois Torture Inquiry and Relief Commission Act (775 ILCS 40/1 *et seq.* (West 2018)). Following a hearing, the circuit court determined petitioner was not entitled to the suppression of his inculpatory statement to authorities and dismissed his claim. Petitioner appealed.

¶ 4       On appeal, petitioner contends the State failed to carry its burden "to show that the statements attributed to [him] were not the result of coercion and misconduct, necessitating suppression" and, further, "the unrebutted evidence of the interrogating detectives' refusal to honor [his] clear, repeated invocation of his right to counsel further support suppression of the statements attributed to [him]." Petitioner argues the circuit court misapplied the burden of proof and failed to recognize the State's burden to prove the voluntariness of his statement by a preponderance of the evidence, which it failed to meet.

¶ 5       For the following reasons, we affirm.

¶ 6                                    BACKGROUND

¶ 7       We recount only those facts relevant to the issues raised in this appeal because the underlying facts are detailed in our judgment affirming petitioner's conviction and sentence on direct appeal. *People v. Fair*, No. 1-03-0983 (2004) (unpublished order under Illinois Supreme Court Rule 23).

¶ 8       Around midnight on July 22, 1998, a gunman robbed William Jones and Chris Stubblefield outside the Anywhere But Out lounge. The gunman grabbed a chain from Jones's

neck, and as Stubblefield tried to walk away, the gunman walked up behind him and fatally shot him in the back.

¶ 9        More than a month later, police arrested petitioner and questioned him about the incident. Petitioner gave an oral inculpatory statement to detectives. An assistant state's attorney reduced petitioner's oral statement to writing but petitioner refused to sign the prepared statement.

¶ 10        Before trial, defense counsel filed a motion to suppress petitioner's statements to detectives and Assistant State's Attorney Adrian Mebane. According to the State, petitioner's initial motion was a "Boilerplate" motion alleging that his inculpatory statements were the product of physical and mental coercion by the authorities during interrogation. Defense counsel subsequently amended the motion with specific allegations that petitioner was kicked in the shins by a police officer wearing cowboy boots and that he was denied his asthma medication and food. However, defense counsel withdrew the motion to suppress after consulting petitioner.

¶ 11        At trial, Detective Przepiora testified he and Detective Ayers arrested petitioner at a residence on September 1, 1998. Petitioner's white Camaro was parked outside. Two tactical officers assisted in the arrest. Petitioner was advised of his *Miranda* rights and transported to Area 2 police station. After turning petitioner over to Detectives Porter and Brown, Przepiora had no further contact with petitioner.

¶ 12        Detective Porter testified that he and Detective Brown investigated the murder of Stubblefield and learned of petitioner's involvement through the gunman, Lamont Reaves. They interviewed petitioner, who agreed to answer their questions. During the interview, petitioner stated he popped the hood of his Camaro for Reaves to retrieve a handgun, but he changed his story and said Thomas popped the hood. Afterwards, Assistant State's Attorney Mebane spoke with petitioner and memorialized his statement.

¶ 13     Assistant State's Attorney Mebane testified he asked petitioner if he wanted his oral statement reduced to a handwritten statement or transcribed by a court reporter, and petitioner stated a handwritten statement was fine.

¶ 14     Defense counsel declined to cross-examine Mebane about the statement he prepared before it was published to the jury. Defense counsel instead used petitioner's handwritten statement to challenge Mebane's credibility and argue that neither petitioner nor the detective who initially questioned petitioner signed the statement.

¶ 15     According to the handwritten statement, petitioner was a senior at Roosevelt University. His friend Jack gave him a loaded .38 caliber revolver on July 21, 1998. The next day, he asked his friend Chris Thomas, who was borrowing his Camaro, to pick him up because his driver's license was suspended. They drove around for a couple of hours and drank beers outside a friend's house. There, Lamont Reaves, whom petitioner knew as "King," mentioned knowing someone easy to rob in Harvey, Illinois. The three of them went back to petitioner's house to retrieve the revolver. Reaves hid the revolver under the hood and by the battery of petitioner's Camaro. They drove around Harvey for several hours and did not find the person Reaves mentioned. On their way back to Chicago, they stopped around 104th Street and Michigan Avenue because petitioner wanted to sell some liquor and Reaves knew people there. When William Jones and Chris Stubblefield pulled up in a car across the street and got out, Reaves told him to pop the hood of the Camaro, but Thomas popped the hood. Then, Reaves retrieved the revolver and confronted them. Reaves pointed the revolver at Jones's forehead and grabbed a chain from his neck. Stubblefield tried to walk away, and Reaves shot him in the back. Petitioner drove away in his Camaro with Reaves and Thomas. The next day, petitioner gave the revolver back to his friend Jack.

¶ 16    Petitioner did not testify. Ultimately, the jury found him guilty of murder during the commission of armed robbery.

¶ 17    On direct appeal, this court affirmed petitioner's conviction and sentence. *People v. Fair*, No. 1-03-0983 (2004) (unpublished order under Illinois Supreme Court Rule 23). Petitioner argued the trial court erred in admitting his handwritten statement because it lacked a proper foundation, and defense counsel was ineffective for failing to object to its admission and for withdrawing the pretrial motion to suppress. However, petitioner failed to raise the issue at trial or in a posttrial motion. We declined to consider the issue under the doctrine of plain error because defense counsel relied on the handwritten statement to challenge the credibility of the assistant state's attorney who prepared it and therefore defense counsel's decision not to seek suppression of the handwritten statement before trial or object to its admission at trial was a matter of trial strategy that petitioner agreed with.

¶ 18    In 2005, petitioner filed a *pro se* postconviction petition alleging, in part, defense counsel was ineffective for failing to file a motion to suppress his statement and failing to challenge the validity of his arrest. The circuit court summarily dismissed the petition as frivolous and patently without merit. In doing so, the court found these claims were barred by *res judicata* because petitioner raised them on direct appeal.

¶ 19    Petitioner appealed the summary dismissal of his petition, and this court affirmed the judgment of the circuit court. *People v. Fair*, No. 1-05-3259 (2007) (unpublished order under Illinois Supreme Court Rule 23). Then pursuant to a supervisory order from our supreme court, we reconsidered the matter under *People v. Hodges*, 234 Ill. 2d 1 (2009), and determined a different result was unwarranted. *People v. Fair*, No. 1-05-3259 (2010) (unpublished order under Illinois Supreme Court Rule 23).

¶ 20    Petitioner filed a petition for a writ of *habeas corpus* in federal district court alleging, in part, that police questioned him notwithstanding his request for a lawyer and denied him food, sleep, and medical treatment for more than 30 hours before he gave his statement. The district court denied the petition. *United States ex rel. Fair v. Hardy*, No. 10 C 7710 (N.D. Ill. April 18, 2011) (memorandum opinion and order).

¶ 21                    Illinois Torture Inquiry and Relief Commission Proceedings

¶ 22    In  May 2011, petitioner filed a claim of torture with the Illinois Torture Inquiry and Relief Commission. Petitioner named Detective Przepiora, Detective Porter, and Assistant State's Attorney Mebane; he also described an unknown detective 5'5"-5'6" and 140-150 pounds. Petitioner alleged he was "kicked in the lower leg and threatened to be shot while Detective McDermott rested his hand on service weapon" and "kept awake, chained to metal ring on wall, denied asthma medication + food – for period over 30 hours, [and] was also denied access to lawyer."

¶ 23                            Petitioner's Interview with the Commission

¶ 24    The Commission interviewed petitioner regarding his claim in June 2012. Petitioner stated he has asthma and severe skin allergies. He went to the emergency room in 1995 after he broke out in hives and could not breathe. The emergency room doctor treated his symptoms and prescribed albuterol and steroid inhalers. He needs to use his inhalers every 10 to 12 minutes.

¶ 25    According to petitioner, police officers arrested him at his mother's house and took him in handcuffs to Area 2 for questioning. The officers did not allow him to take his inhalers, and the handcuffs gave him hives. At Area 2, his asthma flared up and he felt like he was breathing through a straw. His symptoms would have been apparent to the detectives and a female assistant state's attorney who were in the interrogation room. When he asked for his medication, Detective

Przepiora explained they would have "to start the whole process over again" if he went to the hospital for treatment. After he gave his statement, he was processed at the jail and examined at Cermak Health Services. There, he received an asthma inhaler and Benadryl.

¶ 26    As to his allegations of physical coercion, petitioner stated Detective Przepiora threatened him with a gun and a short white officer wearing cowboy boots kicked him in the shins once and called him a murderer. That officer then "rested his hand on [his] revolver" and dared him to "make a move." Petitioner recalled that officer had testified in one of his cases in Markham, but he did not know his name. Meanwhile, Detective Brown was professional and did not coerce him.

¶ 27    Petitioner stated he was deprived of sleep and questioned persistently at Area 2. The cold room and his asthma kept him awake. About 30 hours later, Detective Porter entered the room and accused him of being involved in Stubblefield's murder, but Petitioner denied the detective's accusations. Detective Porter gave him a sandwich and fries, and while he ate, he agreed to give a statement repeating what the detective told him to say. Then, Assistant State's Attorney Mebane entered the room and prepared a handwritten statement for his signature and initials. He refused and told Mebane he wanted a lawyer and would say nothing more.

¶ 28    Mebane and Porter then told petitioner that his codefendant, Reaves, claimed petitioner owned the car and the gun, and that petitioner popped the hood to give Reaves access to the weapon. They also told him the surviving victim, Chris Jones, gave a statement. They suggested he sign the prepared statement so they could help him out and "make things easier;" otherwise, he would go to jail. He refused and neither of them tried to physically coerce a signature from him.

¶ 29    Petitioner conceded his defense counsel drafted, but did not file, a motion to suppress raising these allegations and he did not testify at trial. Petitioner also admitted he was with Reaves before, during, and after the shooting.

¶ 30    At the end of petitioner's interview, the executive director of the Commission advised petitioner to find the name of "the detective with the cowboy boots."

¶ 31                            The Commission's Recommendation

¶ 32    The Commission issued a case disposition in May 2013. The Commission found there was sufficient evidence of torture to conclude petitioner's claim was credible and to merit judicial review for appropriate relief. In doing so, the Commission acknowledged petitioner's claim was "not corroborated by physical evidence, or by a pattern of such conduct by the police officers involved." However, the Commission stated it was troubled by the handwritten statement and the prosecutor's "dubious testimony" about the circumstances surrounding the preparation of the statement, which were "significant indicators of the fact that it was not voluntarily made." The Commission noted the case against petitioner "was practically non-existent without the statement, creating a powerful incentive to obtain the statement."

¶ 33    After the Commission referred petitioner's claim to the circuit court for judicial review, the State moved to dismiss the matter and claimed the Commission's recommendation failed to state a valid cause of action under the Illinois Torture Inquiry and Relief Commission Act because the alleged torture happened years after John Burge was fired from the Chicago Police Department. Although the circuit court granted the State's motion, this court found petitioner's claim fell within the scope of the Act, and we reversed and remanded the cause to the circuit court for consideration on the merits. *Mitchell v. People*, 2016 IL App (1st) 141109.

¶ 34                        Evidentiary Hearing in the Circuit Court

¶ 35      The evidentiary hearing commenced on April 29, 2019, and the parties delivered opening statements. Petitioner's attorney stated that authorities coerced his client to give an inculpatory statement, and they would show, by a preponderance of the evidence, his statement was "the product of severe physical or emotional coercion." Petitioner's attorney asked the circuit court to vacate his client's murder conviction and grant a new trial or dismiss all charges outright. The State asserted petitioner voluntarily gave his statement and thus it should not be suppressed. The State cited the Commission's observation that there was no physical evidence to support petitioner's claim of physical abuse.

¶ 36                          Direct Examination of Petitioner

¶ 37      Petitioner testified that on September 1, 1998, two plainclothes officers knocked on the front door of his mother's house and asked to talk to him. When he asked whether they had any warrants, the officers threatened to shoot through the door if he did not open it. He retreated into the TV room when he heard them kick the door. Then one of the officers called the house and asked him again to open the door. Moments later, the cable went out and the kicking resumed. Petitioner opened the door because he did not want the officers kicking it in. The officers told him he was under arrest for murder and handcuffed him. When he asked to bring his asthma medication to the police station, the officers ignored him.

¶ 38      At Area 2 police station, Detective Przepiora seated petitioner on a metal bench in an interview room and handcuffed his left arm to a ring on the wall. Petitioner asked again for his asthma medication and a lawyer, but the detective ignored him and left the room.

¶ 39      After Detective Przepiora left, a short white detective wearing cowboy boots entered the interview room. Petitioner identified a photograph of Detective Michael McDermott as that person. Petitioner testified McDermott appeared angry and called him names. As petitioner

stared at McDermott's angry face, he felt "something just exploded against my lower left leg under the – under the kneecap." The pain in his left shin was excruciating, and he reached down to shield his knee in case McDermott kicked him again. At that moment, McDermott "took another two steps back with his right leg, or his right foot rather, and his arm immediately went down to his service weapon." McDermott threatened to shoot petitioner, called him names, and tried to kick him again. Petitioner moved his left leg back and forth to avoid being kicked and only suffered glancing contact. Afterwards, McDermott left the interview room.

¶ 40    When Detective Przepiora returned two hours later, petitioner told him what happened. He also asked for his asthma medication and a lawyer, but Przepiora ignored his request, uncuffed his arm, and left the room. At that time, petitioner noticed his shin was bleeding from McDermott's kick, which scraped the skin off. Subsequently, Przepiora returned three or four times and probed him for details about the shooting. He denied knowing anything and asked for a lawyer. As Przepiora left the room, petitioner saw an officer that he recognized from preparatory school. Hoping that his former classmate would hear him, he kicked the door and yelled for a lawyer. That prompted Przepiora to return and handcuff him to the wall.

¶ 41    Hours later, McDermott returned to the room with a handful of files and photographs. McDermott told petitioner he knew about his involvement in the murder of Stubblefield as well as two unrelated armed robberies. McDermott explained there were witnesses who gave statements about him and would view a lineup that included him. McDermott also showed him photographs that included the deceased victim Stubblefield. This time, McDermott was aggressive but not physical in his questioning. Petitioner denied his involvement and McDermott left the room.

¶ 42    Detective Porter entered the room later that night; he was not aggressive and treated petitioner like a friend. Petitioner told Porter that McDermott kicked him earlier, and he asked for his asthma medication and a lawyer. Porter replied he wanted to talk about the case first. When petitioner repeated his request for a lawyer, Porter left the room. Petitioner did not sleep that night. The lights were on, his left arm was handcuffed to the wall, and he had not eaten since the night before.

¶ 43    Detective Porter returned to the room with Detective Brown. When they asked him again about the murder, petitioner asked for a lawyer and explained he had nothing to say.

¶ 44    The next morning, Detectives Porter and Brown returned to the room with a female assistant state's attorney. At the time, petitioner was developing welts all over his body from the handcuffs and having difficulty breathing. The assistant state's attorney asked the detectives what was wrong with petitioner, and they ushered her out.

¶ 45                        Petitioner's Oral Statement

¶ 46    When Detective Porter returned to the room, petitioner asked for something to eat. Porter responded, "If you want to eat, you got to give us something." So, petitioner agreed and admitted, "yeah, I was there at the lounge that night. I was selling alcohol." He explained to Porter that it was dollar drink night at the Anywhere But Out lounge and he was trying to sell three small bottles of Hennessey. Then Porter brought him two cheeseburgers with fries and left the room. After he ate, Detective Brown entered the room and made small talk until Porter returned.

¶ 47    Detective Porter told petitioner he was not the target of their investigation, but they needed his help by giving a statement against Reaves, the gunman. Porter explained they needed him to say he went to the lounge with Reaves and Thomas to commit a robbery and Reaves shot

the victim; if he cooperated, they would let him go home. That sounded good to petitioner, so he agreed to say whatever they wanted him to say. Petitioner explained he was in "survival mode" and was not sure what would happen if he kept denying involvement.

¶ 48                                    Petitioner's Handwritten Statement

¶ 49          Assistant State's Attorney Mebane entered the room and introduced himself to petitioner. Then, while Detective Porter asked petitioner questions about what happened during the robbery, Mebane wrote down his responses, which he made up according to what Porter told him to say earlier. When Mebane asked him to sign the prepared statement, he worried that some of his responses might also get him charged with murder. So, he told Mebane he preferred to speak to a lawyer before signing anything.

¶ 50          Petitioner explained, "saying stuff is one thing" but "if I commit my signature to this stuff that I know is not accurate, I mean, that's a little more – it's kind of like signing my name to it. I'm kind of verifying something. I didn't feel comfortable doing that."

¶ 51          Mebane was visibly upset by petitioner's refusal to sign the prepared statement. Mebane asked petitioner for his signature several more times and petitioner refused. Then Mebane and Porter left the room. Shortly thereafter, petitioner was transported to Cook County jail and processed. He was unable to call his mother until several days later.

¶ 52          Additionally, petitioner testified defense counsel filed a pretrial motion to suppress statements that included an allegation that a short white officer wearing cowboy boots kicked him in the shins. Defense counsel withdrew the motion after consulting with petitioner. Defense counsel explained to petitioner the judge might suppress the handwritten statement but not his oral statement; they could use the handwritten statement to show the jury he did not sign it and

that Mebane wrote petitioner's name on it. Petitioner testified he agreed with defense counsel's advice.

¶ 53    Due to a scheduling issue at that time, the parties agreed for petitioner's attorney to call former Assistant State's Attorney Mebane as a witness and then for the State cross-examine petitioner afterwards.

¶ 54                              Assistant State's Attorney Mebane

¶ 55    Mebane testified about his procedure for interviewing suspects during his assignment to the felony review unit. Typically, he would ask suspects preliminary questions about how they were being treated by police, whether they were under the influence of any substances, and whether they had eaten. He would also explain to suspects the available methods of memorializing a statement; they could give an oral statement, a handwritten statement, or a court reported statement.

¶ 56    For handwritten statements, Mebane testified, "my process was usually to sit right down next to the suspect and have a give-and-take, a back-and-forth almost verbatim as to what [he] or she would talk with – he or she witnessed or what actions that he or she engaged in." Before doing so, he would read aloud from the preprinted *Miranda* warnings on the statement form. Then, he would print the suspect's name below the warnings and ask for the suspect's signature. He would also mention they would be asked to sign the statement after it was prepared. If the suspect suggested any changes to the prepared statement, he and the suspect would initial next to them at that time.

¶ 57    Around 6:00 p.m. on September 2, 1998, Mebane arrived at Area 2 police station where petitioner was being held for questioning. Given the passage of time since then, Mebane did not independently recall the details surrounding his preparation of petitioner's written statement. For

instance, he did not recall reviewing petitioner's arrest report or being concerned about how long petitioner had been in custody.

¶ 58    Mebane identified the handwritten statement that he prepared for petitioner. Although the statement reflected that it was taken at 9:32 p.m., Mebane testified he would have also met with petitioner earlier to introduce himself and get a general statement from petitioner about what happened. He noted the statement reflected that Detective Porter was present when it was taken, but he did not recall whether the detective was present for the duration. Mebane also noted petitioner initially claimed he, not Thomas, popped the hood of his Camaro so Reaves could retrieve the revolver. Nonetheless, he did not suspect that petitioner's statement was "staged." Mebane recalled that petitioner would not sign anything without a lawyer but agreed to continue discussing what happened.

¶ 59    On cross-examination, Mebane denied fabricating the handwritten statement or conspiring with Detective Porter to attribute a false statement to petitioner; he drafted the statement while interviewing petitioner and petitioner did not ask him for a lawyer. While Detective Porter was gone, Mebane asked petitioner how he was being treated in custody and petitioner said he was being treated well. Petitioner did not complain about being unable to sleep. Rather, he was alert during questioning. He did not appear to be under the influence of any substances. Nor did he appear to have hives or difficulty breathing. Mebane testified that petitioner never mentioned that an officer kicked him in the leg or threatened him with a gun. Mebane saw no injuries on petitioner, who was wearing shorts.

¶ 60    On further cross-examination, Mebane denied trying to force petitioner to sign the prepared statement; rather, he wrote on the last page that petitioner refused to provide his signature without a lawyer. Also, no one from the Commission contacted him about this case.

¶ 61    On redirect examination, Mebane testified he did not remember exactly when petitioner refused to initial any changes to the statement or to sign the completed statement, but it happened during the process and again at the end. He also did not remember whether he asked petitioner to sign the *Miranda* warnings before drafting the statement with petitioner. On recross examination, Mebane testified that petitioner orally confirmed his understanding of the *Miranda* warnings before they proceeded.

¶ 62              Petitioner's Testimony on Cross-Examination

¶ 63    After Mebane's testimony, the State cross-examined petitioner. Petitioner identified the papers he submitted to the Commission in support of his torture claim, which included documentation about his asthma. Petitioner acknowledged that "Exhibit E, Documentation of Asthma Condition" stated he claimed to take asthma medication but declined any treatment at the time. He conceded he did not mention to the Commission that officers refused to take him to the hospital but maintained he still needed his asthma medication. Petitioner also identified a photograph of his head with no hives that was taken when he was processed at the jail.

¶ 64    Additionally, petitioner identified the pretrial motion to suppress statements that defense counsel filed on August 24, 1999. He acknowledged the motion did not allege that a detective at Area 2 kicked him; the motion only raised a general allegation of physical coercion. Petitioner identified the amended motion that defense counsel filed on March 31, 2000, and again the motion only raised a general allegation of physical coercion. Then petitioner identified an amended motion that defense counsel filed on October 25, 2000; this time, the motion alleged that a white officer wearing cowboy boots kicked petitioner's shins. Petitioner acknowledged he agreed with defense counsel's advice to withdraw the motion.

¶ 65    Petitioner further testified he did not learn the name of the detective who kicked him until after his interview with the Commission. He saw McDermott's name in police reports from his other robbery cases, which he obtained pursuant to a Freedom of Information Act request sometime after 2004 when his direct appeal in this case was affirmed. He also identified a police report in this case, which was dated September 2, 1998, signed by McDermott, and stated that petitioner made a statement at 7:15 p.m. regarding several armed robberies. Petitioner also recognized McDermott from a photograph in a newspaper article about Detective Jon Burge at Area 2, which he obtained from fellow inmates with similar claims against officers at Area 2. Previously, those inmates helped draft his postconviction petition.

¶ 66    On further cross-examination, petitioner stated he agreed to give an oral statement about Stubblefield's murder because of the abuse by McDermott but then refused to sign the handwritten statement. Petitioner explained on redirect examination that he agreed to give an oral statement because Detective Porter told him he was not the target of their investigation, and he refused to sign the handwritten statement after seeing Assistant State's Attorney Mebane writing down what he was saying. According to petitioner, "this writing stuff down, it stood like [Mebane's] trying to, like, you know, get me in trouble, too, you know, charge me with something now." Petitioner added, "saying stuff is one thing" but "if I commit my signature to this stuff that I know is not accurate, I mean, that's a little more."

¶ 67                                              Atsia Fair

¶ 68    Petitioner's mother Atsia Fair testified that petitioner was not home when she returned from work on the evening of September 1, 1998. The front door was unlocked, and the latch was misaligned with the strike plate. Inside, things were in a disarray and the television was disconnected.

¶ 69    Ms. Fair further testified that petitioner had asthma and required medication. Petitioner used an inhaler and went to the hospital for breathing treatments when symptoms were severe. Petitioner was also allergic to grass and shrubs, which gave him hives. However, she never saw petitioner have trouble breathing and hives at the same time.

¶ 70                                Victor Way

¶ 71    Victor Way testified about his encounter with Detective Porter and Assistant State's Attorney Mebane in February 1998, several months before petitioner's arrest in this case. Way was arrested while robbing a Kentucky Fried Chicken with a handgun. The arresting officers took him to Area 2 police station, where Porter questioned him. Way asked for a lawyer, but Porter continued to question him. Eventually, the detective and Assistant State's Attorney Mebane asked him to sign a handwritten statement. Way identified the handwritten statement, which he refused to sign because it was not consistent with what he told Porter. He admitted trying to rob the KFC with a handgun, but he never told Porter he bought the handgun for $25, agreed to give some of the money to the person who drove him there, displayed a gun, or took money out of the cash register. Ultimately, he pleaded guilty to the KFC robbery along with several other robberies as part of a plea deal.

¶ 72    On cross-examination, Way stated that Porter and Mebane treated him well. There were inconsistencies in the handwritten statement that Mebane prepared, but Way did not suggest any changes. Although he refused to sign the handwritten statement, he did not seek its suppression; on redirect examination, he explained he did not challenge the handwritten statement because he pleaded guilty.

¶ 73                            Detective McDermott

¶ 74     Petitioner's next witness, Detective McDermott, did not testify. The State tried to subpoena McDermott as a courtesy to petitioner but was unsuccessful, and the circuit court continued the hearing to allow petitioner the opportunity to subpoena McDermott. Petitioner made numerous attempts to serve McDermott with a subpoena but was unsuccessful.

¶ 75                          Documentary Evidence of McDermott's Misconduct

¶ 76     In addition to live testimony, petitioner introduced into evidence exhibits about prior allegations of misconduct by Detective McDermott including:

1.  A deposition transcript where McDermott asserted his fifth amendment rights in response to allegations that he and other detectives physically abused suspects in several cases.

2.  Investigative documents from the Cook County State's Attorney's office finding McDermott lied to the Office of Professional Standards and at a suppression hearing.

3.  A petition and order granting McDermott immunity to testify in Jon Burge's federal court trial.

4.  A suppression hearing transcript concerning McDermott's involvement in a 1991 murder investigation, where a fellow detective allegedly destroyed the defendant's seizure medication during interrogation and squeezed his testicles until he confessed.

5.  A Special State's Attorney report regarding allegations McDermott abused Alphonso Pinex in 1985 by hitting his ribs, kneeing him, and holding him down while another detective beat him.

6.  A suppression hearing transcript concerning McDermott's involvement in a 1990 armed robbery investigation, where he allegedly denied defendant Tony Anderson a phone call and threatened him with a gun placed against his head.

7. The affidavit of Robert Allen, Tony Anderson's codefendant, who overheard Anderson crying out during interrogation and was then similarly threatened.

8. A transcript concerning McDermott's involvement in a 1992 murder investigation, where he and fellow officers allegedly "started popping their knuckles" while interrogating Keith Mitchell without the presence of his mother and lawyer.

9. Affidavits from two witnesses that McDermott interrogated in the 1992 murder investigation. Jermaine Bates alleged that McDermott hit him in the head to coerce a statement against Mitchell. Lanell Townsend alleged that McDermott smacked him, choked him, banged his head against the wall, and squeezed his handcuffs to coerce a statement against Mitchell.

10. An order vacating Keith Mitchell's conviction.

11. A complaint register file regarding a 1993 murder investigation, where the Office of Professional Standards determined the allegations that McDermott slapped Joseph Carroll and pushed his head against a radiator were unfounded.

12. Marvin Scott's complaint that in 1993, McDermott ignored his request for a lawyer and hit him in the eye and ribs during interrogation.

13. Michael Thomas's complaint that in 2001, McDermott, Przepiora, and another officer slapped, punched, and handcuffed him to a wall without food, water, sleep, or access to the restroom during interrogation.

14.  John Knight's affidavit stating that McDermott choked, slapped, and threatened him with a gun against his head during interrogation.

15. A transcript from a 2004 special grand jury proceeding where McDermott invoked his fifth amendment rights.

16. A chart of police abuse cases from 1984 to 1999.

¶ 77                                  The State's Documentary Evidence

¶ 78          The State did not call any witnesses but presented documentary evidence including:

1.  Petitioner's claim of torture that he filed with the Commission.

2.  An audio recording of petitioner's interview with the Commission.

3.  The handwritten statement attributed to petitioner.

4.  The handwritten statement attributed to codefendant Reaves.

5.  Excerpt of Mebane's trial testimony about his preparation of petitioner's statement.

6.  Petitioner's motion to suppress statements.

7.  Petitioner's amended motions to suppress.

8.  A photograph of petitioner upon his admission to jail.

9.  Documentation about petitioner's asthma.

10. Excerpt from transcript where defense counsel withdrew the suppression motion.

¶ 79                                    The Circuit Court's Order

¶ 80          The circuit court issued a 53-page order dismissing petitioner's claim of torture. In doing so, the court stated the legal framework of the hearing: a petitioner's initial burden is to show that newly discovered evidence would likely have resulted in the suppression of the statement; if the petitioner satisfies that burden, then the State bears the burden of proving the statement was voluntary by a preponderance of the evidence; and if the State establishes the voluntariness of the statement, the burden shifts back to the petitioner to present evidence to the contrary.

¶ 81          The circuit court ultimately found that petitioner failed to meet his initial burden. In so finding, the court first considered whether petitioner's evidence of prior alleged police abuse at Area 2 was relevant to his torture claim. The court examined the factors identified by our

supreme court in *People v. Patterson*, 192 Ill. 2d 93, 145 (2019), as relevant in determining if new evidence of a pattern of abuse is relevant and would have changed the outcome at a pretrial suppression hearing.

¶ 82     Applying those factors, the court stated the prior allegations of misconduct by McDermott from 1984 to 2002 showed a pattern and practice of abuse. Then the court stated those prior allegations "technically" met another factor – they involved the same officer as in this case, McDermott.

¶ 83     However, the court stated petitioner's allegations against McDermott were not "strikingly similar" to the abuse described in his new evidence; the specific methods of abuse described in those prior allegations were "quite different" from petitioner's allegations. Although petitioner alleged that McDermott threatened to shoot him while resting a hand on his service weapon, Tony Anderson and John Knight alleged that McDermott placed a gun to their heads and threatened to shoot them. Although petitioner alleged that McDermott kicked him with cowboy boots, other suspects alleged they were kicked and struck in various ways including by multiple officers, but they made no mention of cowboy boots. Despite these differences, the court acknowledged petitioner consistently alleged he was kicked by a white officer wearing cowboy boots since before trial.

¶ 84     The court noted, however, petitioner did not mention being threatened with a gun until long after trial and his allegations of abuse changed over time. For instance, at his interview with the Commission in 2012, petitioner claimed he was kicked once. Then during this evidentiary hearing, petitioner testified that McDermott repeatedly kicked him in the shins.

¶ 85     The court questioned petitioner's inability to name the detective who kicked him with cowboy boots until after his interview with the Commission. The court noted petitioner admitted

possessing police reports from his other robbery cases that listed McDermott's name, but he claimed he did not associate McDermott's name with the officer who kicked him until he obtained McDermott's police report from this case, which stated that petitioner made a statement at 7:15 p.m. on September 2, 1998, regarding several armed robberies. However, the court noted petitioner never told the Commission that the detective who kicked him returned later and questioned him about any of his cases, and McDermott's September 2 police report does not corroborate petitioner's testimony that McDermott questioned him on September 1.

¶ 86    The court added the circumstances surrounding petitioner's identification were troubling. The court noted although petitioner testified his first sight of McDermott was from a photograph in an article that he obtained from inmates who had previously helped him with his postconviction petition, he did not see the photograph before filing his claim with the Commission. Rather, petitioner only identified McDermott as the officer who abused him after his interview with the Commission, when the executive director strongly advised petitioner to learn the name of the detective.

¶ 87    Consequently, the court found petitioner's ignorance about the identity of his alleged abuser and his eventual identification of McDermott not credible. The court stated the evidence supported the inference that petitioner fabricated the allegations against an unnamed detective and the advice to find the detective's name motivated petitioner to fabricate a name. The court also stated the evidence supported the inference that petitioner altered his story to account for McDermott's police report by testifying that McDermott interviewed him a second time after kicking him. The court noted petitioner's allegations of abuse were inconsistent and the only reason the prior allegations of McDermott's misconduct were relevant was because petitioner

named McDermott as his abuser. The court determined the evidence of prior allegations of abuse by McDermott was of little relevance to his claim of abuse by McDermott.

¶ 88     Next, the court considered the new evidence concerning McDermott's prior allegations of abuse together with the circumstances surrounding petitioner's interrogation at Area 2. In doing so, the court declined petitioner's request to draw an adverse inference from McDermott's failure to testify at the evidentiary hearing. The court found no authority supporting petitioner's proposition requiring an adverse inference to be drawn from a witness who allegedly avoided service of process.

¶ 89     The court further noted petitioner's testimony about his treatment by other people at Area 2 was inconsistent with the responses he gave during his interview with the Commission. Petitioner told the Commission he was questioned persistently at Area 2 and thus deprived of sleep, but he testified at the evidentiary hearing that he could not lie down because his arm was handcuffed to the wall. He told the Commission that when he asked for his asthma medication, Detective Przepiora stated they would have "to start the whole process over again" if he went to the hospital for treatment. However, petitioner testified at the hearing that it was McDermott, not Przepiora, who said that during a second encounter in the interview room. Also, petitioner told the Commission he gave a statement to Detective Porter while eating food the detective brought him, but he testified at the hearing that Porter offered him food only if he agreed to give a statement.

¶ 90     The court also noted that petitioner's testimony about his alleged abuse by McDermott was not corroborated by physical evidence. Petitioner testified the kick from McDermott scraped the skin off his shin, he developed skin welts over his body from the handcuffs and had difficulty breathing. However, documentation of petitioner's asthma condition indicated he declined any

medical treatment when he was processed at the jail and a photograph of petitioner did not show he had any hives at that time. Also, Assistant State's Attorney Mebane's testimony at trial and at the evidentiary hearing contradicted petitioner's claim that he was in distress during questioning. The court questioned the severity of petitioner's asthma and skin allergies when he was questioned at Area 2.

¶ 91     The court found petitioner to be "wholly incredible" after observing his demeanor as he testified at the evidentiary hearing and listening to the audio recording of petitioner's interview with the Commission. The court gave little to no weight to petitioner's allegations of abuse because his testimony at the hearing was repeatedly contradicted by other evidence including his interview with the Commission. The court determined the new evidence of prior allegations of misconduct by McDermott would not have arguably changed the outcome at a suppression hearing, and thus petitioner failed to meet his initial burden.

¶ 92     Moreover, even if petitioner had met his initial burden, the court determined the totality of the circumstances showed the State met its burden of establishing that petitioner's statement was voluntary. The court found Mebane to be an "extremely" credible witness in comparison to petitioner and noted the Commission made no attempt to interview Mebane about his trial testimony or the handwritten statement. The court credited Mebane's testimony that it was partway through his preparation of petitioner's handwritten statement when he asked petitioner to initial a correction and petitioner refused to sign anything without a lawyer present. The court noted although Mebane did not independently recall much of his interview with petitioner at the hearing, his prior testimony about drafting petitioner's statement largely comported with his procedure for memorializing a suspect's statement. The court stated Mebane consistently testified that petitioner acknowledged his *Miranda* rights orally, agreed to give a handwritten

statement, and continued to cooperate despite refusing to sign the statement. By contrast, the court noted petitioner's testimony "about what 'went wrong' at the time of his statement was that he had been previously coerced by McDermott's physical abuse, Porter's promises of food, his denial of counsel, sleep, and medication," but petitioner "specifically testified that he was tortured into giving the *oral* statement, not the *written* statement." The court added that petitioner never testified he told Mebane that he was mistreated by police. The court also noted the other handwritten statements that Mebane prepared while in the felony review unit were substantially similar to petitioner's statement and comported with Mebane's testimony about his general procedure. The court stated Mebane's testimony supported the conclusion that petitioner gave a voluntary oral statement, then agreed to give a handwritten statement, but later decided not to sign the statement. On the other hand, the court noted petitioner's testimony that signing an inaccurate statement was "a little more" than "saying stuff" and stated that explanation did not reflect the thoughts of a person whose will was overborne. Accordingly, the court dismissed petitioner's claim of police abuse. This appeal follows.

¶ 93                                            ANALYSIS

¶ 94        Petitioner claims he presented compelling evidence at the evidentiary hearing of an involuntary statement and the State failed to establish a *prima facie* case that the statement was voluntarily made.

¶ 95        An evidentiary hearing under the Torture Inquiry and Relief Commission Act (775 ILCS 40/1 *et seq.* (West 2018)) is like a third-stage evidentiary hearing under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2016)), where the claimant has the chance to show by a preponderance of the evidence that a confession was coerced. *People v. Christian*, 2016 IL App (1st) 140030, ¶ 78.

¶ 96    At an evidentiary hearing, the circuit court acts as the factfinder and resolves any conflicts in the evidence and determines the credibility of witnesses and the weight to give their testimony. *People v. Harris*, 2021 IL App (1st) 182172, ¶ 49. Where, as here, new evidence was presented at the evidentiary hearing and the circuit court made findings of fact and credibility determinations, our standard of review is the manifest error standard. *People v. Carter*, 2017 IL App (1st) 151297, ¶ 132. "The term 'manifest error' means error that is 'clearly evident, plain, and indisputable.' " *People v. Coleman*, 206 Ill. 2d 261, 277 (2002) (quoting *People v. Ruiz*, 177 Ill. 2d 368, 384-85 (1997)). On the other hand, if there were no fact-finding or credibility determinations and the issues were purely questions of law, we apply a *de novo* standard of review. *Carter*, 2017 IL App (1st) 151297, ¶ 132.

¶ 97    Similarly, we apply a bifurcated standard of review to a circuit court's decision regarding the voluntariness of a defendant's statement. *People v. Brown*, 2012 IL App (1st) 091940, ¶ 26. Although we review *de novo* the ultimate question of whether the statement was voluntary, we review the factual question of whether a *Miranda* waiver was knowing and intelligent under the manifest weight of the evidence standard. *Id.* Under the manifest weight standard, we give great deference to the circuit court's findings of fact and credibility determinations. *People v. Guerrero*, 2012 IL 112020, ¶ 19. The court's findings of fact and credibility determinations are against the manifest weight of the evidence if they are arbitrary, unreasonable, and not based on the evidence. *Wilson*, 2019 IL App (1st) 181486, ¶ 62.

¶ 98    A petitioner's initial burden is the same under the Post Conviction Hearing Act and the Torture Act. *People v. Wilson*, 2019 IL App (1st) 181486, ¶ 52. A petitioner must show that new evidence would likely have resulted in the suppression of his confession. *Id.* ¶ 54. If the petitioner satisfies this initial burden, then the State must show the petitioner's statement was

26

voluntary. *Id.* After the State establishes its *prima facie* case that the statement was voluntary, the burden shifts to the petitioner to present evidence that it was involuntary. *Id.* ¶¶ 53-54; see *People v. Kochevar*, 2020 IL App (3d) 140660-B, ¶ 21 (the State always bears the burden of *proof* during a hearing on a motion to suppress an inculpatory statement, but there is a shifting burden of *production*). However, a hearing under the Torture Act may provide relief beyond the relief available under the Post-Conviction Act. Specifically, a petitioner may obtain the suppression of his statement and dismissal of the charges if appropriate.

¶ 99                           Petitioner's Evidence of Torture by McDermott

¶ 100        Within the context of this legal framework, the State asserts the circuit court properly dismissed petitioner's torture claim because he failed to meet his initial burden of showing that new evidence of prior allegations of misconduct by McDermott would likely have led to the suppression of his inculpatory statements. The State argues that petitioner's testimony at the evidentiary hearing, coupled with his evidence about prior allegations of misconduct by Detective McDermott failed to satisfy the factors for admissibility or relevancy under *People v. Patterson*, 192 Ill. 2d 93 (2000). It bears noting the circuit court found the new evidence of prior allegations of McDermott's misconduct was of little relevance to petitioner's claim of abuse by McDermott.

¶ 101        However, we find that petitioner presented consistent, unrebutted allegations and testimony that he was kicked by Detective McDermott.

¶ 102        The court noted although the prior allegations of McDermott's misconduct from 1984 to 2002 revealed a pattern and practice of abuse, petitioner's allegations of abuse in this case were inconsistent, and the prior allegations of McDermott's misconduct were only relevant to the extent petitioner named McDermott as his abuser. The court reasoned petitioner's allegations

were not "strikingly similar" to the methods of abuse described in the prior allegations of McDermott's misconduct; rather, they were "quite different." The court noted that two individuals had alleged McDermott placed a gun to their heads and threatened to shoot them whereas petitioner testified McDermott threatened to shoot him while resting a hand on his service weapon. The court also noted that petitioner consistently alleged he was kicked by a white officer wearing cowboy boots even though other suspects alleged they were kicked and struck in other ways with no mention of cowboy boots.

¶ 103    Although similarity is an important factor to consider in determining whether new evidence of police misconduct in other cases shows a pattern and practice of certain behavior, the question is "not one of exact or perfect identity." *Jackson*, 2021 IL 124818, ¶ 34. Instead, the question is "simply whether there is *sufficient* similarity between the misconduct at issue in the present case and the misconduct shown in the other cases, such that it may fairly be said the officers were acting in conformity with a pattern and practice of behavior." (Emphasis added.) *Id.* That determination depends on the unique circumstances of each case. *Id.* (citing *Patterson*, 192 Ill. 2d at 144-45). Moreover, our supreme court has clarified its use of "strikingly similar" in *Patterson* when comparing the misconduct there to the misconduct shown in other cases. *Id.* ¶ 33 (citing *Patterson*, 192 Ill. 2d at 145). The court explained "it was merely descriptive of the allegations in that case and not a legal test for admissibility." *Id.* Here, the circuit court erred in testing whether petitioner's allegations of police misconduct were "strikingly similar" to the misconduct shown in other cases. See *id.* (the appellate court erred in relying on this descriptive language as a test).

¶ 104    We believe that petitioner's allegations of misconduct in this case were sufficiently similar to the misconduct shown in other cases to show a pattern or practice of behavior. See

*Jackson*, 2021 IL 124818, ¶ 34. Petitioner has consistently alleged he was kicked and his resulting statements were coerced. He raised those allegations in a pretrial motion to suppress, which was ultimately withdrawn after consultation with defense counsel. He raised them again in his petition for a writ of *habeas corpus* in federal district court, albeit unsuccessfully. Then he raised those allegations in his claim of torture that he filed with the Illinois Torture Inquiry and Relief Commission. During his interview with the Commission, petitioner stated his asthma flared up when he arrived at Area 2 for questioning and when he asked for his medication, Detective Przepiora replied they would have "to start the whole process over again" if he went to the hospital for treatment. Petitioner told the Commission that Przepiora threatened him with a gun and a short white officer wearing cowboy boots kicked him in the shins and called him a murderer. That officer "rested his hand on [his] revolver" and baited him to "make a move."

¶ 105    As early as the year 2000, petitioner has consistently alleged that McDermott kicked him in his leg. McDermott did not testify at his trial or at the evidentiary hearing, and the trial testimony of Detectives Przepiora and Porter did not rebut petitioner's allegations he was kicked by McDermott. Although we accord deference to the circuit court's resolution of conflicts in evidence and its determination on witness credibility, " 'the manifest weight standard is not a rubber stamp. It does not require mindless acceptance in the reviewing court.' " *Harris*, 2021 IL App (1st) 182172, ¶ 56 (quoting *People v. Anderson*, 303 Ill. App. 3d 1050, 1057 (1999)).

¶ 106    Contrary to the trial court, we accept petitioner's unrebutted and consistent claims of being kicked by McDermott as true. However, we still come to the same conclusion as the circuit court that the State sustained its burden to show petitioner's statements were voluntary.

¶ 107    Petitioner was arrested on September 1 and taken to the police station. He was kicked in the leg by McDermott at the police station that day. However, it was not until the afternoon on

the following day that petitioner made a statement to Detective Porter. Petitioner testified that Porter treated him like a friend. Porter wanted to ask about the incident and, according to petitioner, petitioner told Porter he was present the night of the shooting. After admitting he was present during the shooting Porter brought him two cheeseburgers and fries. Petitioner then gave a more extensive statement to Porter and subsequently to an assistant state's attorney. Petitioner contends the State failed to carry its burden of proof to show the statements attributed to him were voluntary. He argues the State presented only Assistant State's Attorney Mebane's testimony to establish the voluntariness of that statement. He points out Detective McDermott did not testify at trial, and the trial testimonies of Detectives Przepiora and Porter do not rebut the allegations against them regarding promises of food, denial of counsel, sleep, and medication.

¶ 108   In determining the voluntariness of a suspect's statement, courts consider the totality of the circumstances, which include the presence of *Miranda* warnings, the duration of questioning, and any physical or mental abuse. *Wilson*, 2019 IL App (1st) 181486, ¶ 63. The procedural safeguards set forth in *Miranda v. Arizona* contemplate the possibility of mental and physical coercion during custodial interrogation. *People v. Holloway*, 131 Ill. App. 3d 290, 307 (1985). Accordingly, the test for voluntariness is whether the statement was made freely without compulsion or inducement, or whether the defendant's will was overcome at the time of the confession. *Id.* Relevant factors include the duration of the defendant's detention before making the statement, a disregard for necessities of life, deprivation of counsel, and the defendant's age, education, and experience in criminal matters. *People v. Dodds*, 190 Ill. App. 3d 1083, 1090 (1989).

¶ 109        Here, the circuit court found the totality of the circumstances showed the State met its burden of establishing that petitioner's handwritten statement was voluntarily given. The court stated that Mebane's testimony supported the conclusion that petitioner voluntarily gave an oral statement, then agreed to a handwritten statement, but then decided not to sign it. The court stated petitioner's explanation that signing an inaccurate statement was "a little more" than "saying stuff" did not reflect the thoughts of a person whose will was overborne. "It is unlikely that a person whose will was overborne would be unable to resist confessing, yet at the same time attempt to mitigate the effect of a confession." *People v. Kincaid*, 87 Ill. 2d 107, 120 (1981), quoted in *Christian*, 2016 IL App (1st) 140030, ¶ 110. Although Mebane did not independently recall much of his interview with petitioner during the hearing his testimony at trial about preparing petitioner's statement largely comported with his procedure for memorializing a suspect's statement. Although petitioner testified about the detectives' alleged failure to honor his request for a lawyer, Mebane consistently testified that petitioner acknowledged his *Miranda* rights orally, agreed to give a handwritten statement, and continued to cooperate despite refusing to sign the prepared statement. That petitioner did not sign the *Miranda* waiver is insufficient by itself to establish that he wished to end the interrogation. *People v. West*, 25 Ill. App. 3d 827, 832 (1975). The circuit court noted petitioner's testimony about what "went wrong" was that he was previously coerced by McDermott's physical abuse, Detective Porter's promises of food, his denial of counsel, sleep, and medication; but petitioner "specifically testified that he was tortured into giving the *oral* statement, not the *written* statement." The petitioner never told Mebane that he was mistreated by police at the time he agreed to give a handwritten statement. The circuit court was in the best position to assess the credibility of the witnesses at the hearing, and the court found Mebane's testimony more credible

than the witnesses for the defense. See *Wilson*, 2019 IL App (1st) 181486, ¶ 62 (the trial judge's advantageous position to observe witnesses warrants deference). "Just as a court may not ignore a defendant's uncontroverted testimony that a confession was a product of specific acts of physical or mental coercion, so it may not ignore uncontroverted testimony by the State establishing the voluntariness of a confession." *People v. Lopez*, 114 Ill. App. 3d 1018, 1024 (1983). On the record before us, we cannot find that the circuit court's credibility determination about Mebane was against the manifest weight of the evidence.

¶ 110    Petitioner nevertheless maintains that Mebane's testimony is insufficient as a matter of law to refute his allegations of coercion by police, and he faults the State for failing to produce all material witnesses associated with his confession at the evidentiary hearing, *i.e.*, Detectives Przepiora, Porter, and McDermott. However, our supreme court rejected this material witness rule in *People v. R.D.*, 155 Ill. 2d 122, 139, 144-45 (1993), and stated the prosecution is not required to call all material witnesses to testify at a suppression hearing if it can meet its burden of proving the voluntariness of a confession without such testimony. We find this to be the case here.

¶ 111    Petitioner argues that his statements were the result of being promised food, deprived of sleep and his asthma medication by police for 30 hours, denied his right to counsel, and being kicked by Detective McDermott. He correctly notes there is no testimony from Detective McDermott regarding his allegations of physical abuse, and the assistant state's attorney who prepared his written statement was not present during the initial 30 hours he was in police custody. Even so, confessions made after more than 30 hours have been found voluntary where there has been no evidence that the defendant's rights were violated. *Dodds*, 190 Ill. App. 3d at 1090-91 (citing *People v. Nicholls*, 42 Ill. 2d 91 (1969), *cert. denied*, 396 U.S. 1016 (1970) (34-

hour delay did not invalidate confession); and *People v. Taylor*, 40 Ill. 2d 569 (1968) (50-hour detention did not invalidate confession). An interview room or jail cell "is hardly a paradise for the senses, yet defendants properly processed and charged can be held there for lengthy periods of time." *People v. House*, 141 Ill. 2d 323, 379 (1990). The appellate court has found that any physical discomfort a defendant suffered from his failure to have adequate sleep, medication, or something to eat before giving an inculpatory statement, was insufficient to show his will was overcome. *Holloway*, 131 Ill. App. 3d at 307. Our supreme court has also condemned "the practice of leaving suspects handcuffed in a chair all night" but held the defendant's confession was voluntary. *House*, 141 Ill. 2d at 376 (citing *In re Lamb*, 61 Ill. 2d 383 (1975)).

¶ 112    Finally, petitioner argues that all the statements should be suppressed because the record shows the unrebutted testimony of petitioner that he repeatedly told police he wanted an attorney, but police nevertheless continued to question him. Mebane's testimony does not rebut petitioner's requests for an attorney that he made to officers. Petitioner argues that when a criminal defendant requests an attorney, all questioning should have ceased unless he initiated contact which he did not. See *People v. Coleman*, 2021 IL App (1st) 172416, ¶ 55 (citing *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981)). However, under the Torture Act the circuit court is tasked with determining whether a confession or statement was the product of torture. The State proved petitioner's statements were not the product of torture and petitioner's waiver of his right to counsel was not a consequence of torture. The circuit court was not tasked with determining whether the deprivation of counsel produced a statement or confession. Therefore, petitioner is not entitled to relief under the Torture Act based on the denial of his repeated requests for counsel.

¶ 113        The record before us shows Detective Przepiora testified at trial that he had no further contact with petitioner after transporting him to Area 2 police station and turning him over to Detectives Porter and Brown, and Detective Porter testified at trial that petitioner agreed to answer his questions. The kicking incident with McDermott occurred the day before petitioner gave a statement to an assistant state's attorney. Under the Torture Act, the court is tasked with considering petitioner's claims and determining what relief, if any is appropriate. In view of all the circumstances surrounding petitioner's inculpatory statements, we affirm the circuit court's finding that the State met its burden to show the statements given to an assistant state's attorney were voluntary and not the product of torture. Therefore, petitioner is not eligible for relief, and we affirm the dismissal of his torture claim.

¶ 114                                CONCLUSION

¶ 115        The State established that petitioner's handwritten statement was voluntarily given and, thus, petitioner is not eligible for relief under the Torture Act. Accordingly, we affirm the circuit court's dismissal of petitioner's claim of torture with the Commission.

¶ 116        Affirmed.